HENRY C. PITNEY, JOHN R. EMERY, ALFRED REED, FREDERIC W. STEVENS AND MARTIN P. GREY, VICE-CHANCELLORS.

BERTRAND ADOUE and JOSEPH LOBIT

*v.*

MARY H. SPENCER, individually and as administratrix of John C. S. Spencer, deceased, and EDWARD NUGENT, as administrator of John C. S. Spencer, deceased, et al.

[Submitted March 9th, 1900. Decided March 17th, 1900.]

1. The pendency of another action contesting the validity of a debtor's note is no defence to a bill, based on such note by the creditor against the debtor's widow and administrator, to set aside a conveyance of realty by the debtor

Adoue *v.* Spencer.

previous to his death as fraudulent, where the existence of the indebtedness represented by the note has been fixed by its allowance by decedent's administrator after full opportunity to the widow to require the administrator to contest it.

2. A cotton firm arranged with a bank to advance to it money for purchase of cotton on agreement that the bank was to have the proceeds of the cotton when sold, and such agreement was to continue to the end of the cotton season of 1896-97. One of such partners, on January 30th, 1897, transferred certain of his property to his wife, which he had informed the bank he owned. After the business had progressed for some months, the bank, perceiving that the firm was losing money, pressed for payment, resulting in the firm giving its note on January 22d, 1897, in satisfaction of overdrafts. Both partners were insolvent when the agreement for advancements were made, and such agreement contemplated overdrafts throughout the season. After the note was given, the account was continued, but the note was not credited until the end of the season, and, when credited, a balance was still due from the firm.—*Held*, sufficient to show that the indebtedness accrued prior to the conveyance, which was made to put the property beyond the reach of creditors.

3. A wife contributed voluntarily of her own means to the support of her family without any expectation of her husband repaying it. The husband never acknowledged any legal indebtedness to his wife, or promised to repay the advances, and, on becoming insolvent, for a nominal consideration, conveyed certain property to her to defeat his creditors. There was no contract to convey such property for the wife's contributions to the support of the family.—*Held*, sufficient to establish that such conveyance was not made in satisfaction of a debt due from such husband to his wife.

Heard on the pleadings and evidence.

*Mr. John Neethe* (of Texas) and *Mr. Sherrerd Depue*, for the complainants.

*Mr. William T. Austin* (of Texas) and *Mr. Frank Bergen*, for the defendant Spencer.

PITNEY, V. C.

The complainants, Bertrand Adoue and Joseph Lobit, trading as Adoue & Lobit, claiming to be creditors of John C. S. Spencer, deceased, seek by their bill to set aside a conveyance of real estate situate in Elizabeth, New Jersey, made by Spencer to his wife, the defendant Mary H. Spencer, through the defendant

Coote and his wife, by conveyances dated September 8th, 1896, but severally acknowledged and recorded at a later date. The deed from Spencer to Coote was acknowledged on the 30th of September, 1896 ; that from Coote to Mrs. Spencer was acknowledged on the 30th of January, 1897, and both were recorded on the 1st of February, 1897.

Spencer died in June, 1897. He and his wife were, at the time of his death and for many years before, domiciled at Galveston, in the State of Texas.

On March 25th, 1898, Mrs. Spencer took out letters of administration there, but, as shown by her inventory, found no property of any value.

Later on the complainants applied to the orphans court of Union county, New Jersey, for the issue of letters of administration, and that court, after due publication and upon the appearance of Governor Voorhees as counsel for Mrs. Spencer, on September 6th, 1898, appointed Edward Nugent administrator of the goods and chattels, &c., of John C. S. Spencer in New Jersey, and letters of administration were issued to him on the 14th of September, 1898. He found no property of the intestate here.

On the 31st of October, 1898, the complainants presented to him their sworn claim against the estate of Spencer, which was duly submitted by him to Governor Voorhees, as counsel for Mrs. Spencer, for criticism, and no objection being made he duly allowed the same on the 11th of November, 1898.

This bill was filed on the 15th of November, 1898.

The claim is based on a promissory note of William F. Ladd & Company (of which firm John C. S. Spencer was a member), dated January 22d, 1897, for $12,000, at four months, in favor of Adoue & Lobit, the complainants, and duly delivered to them on that day, and with it was handed to them as collateral to a promissory note of J. C. S. Spencer, dated May 30th, 1896, for $13,601.78, to the order of and endorsed by William F. Ladd & Company, payable on the 31st of May, 1897, with interest at eight per cent. from date.

The bill alleges that at the date of these conveyances Spencer

was seized of the equal undivided one-half of the premises in question, describing them, and sets out the indebtedness on the promissory notes above stated, the taking out of letters of administration, the absence of personal property and the approval of their claim by the administrator; sets out the conveyance through Coote to Mrs. Spencer; alleges that it was without any consideration whatever, and that at the time it was made Spencer was indebted to the complainants in the manner previously stated, and that the conveyances were made for the purpose of defrauding his creditors.

Mrs. Spencer only has appeared and answered. She admits by her answer the conveyance from her husband to her, denies that it was made without consideration and for the purpose of defrauding creditors, but avers that the conveyances were made in good faith, for the purpose of reimbursing and paying, in part, an amount of money due from Spencer to her, exceeding in the aggregate the sum of $45,000, and consisting of numerous sums of money loaned by the defendant to Spencer in his lifetime, and money expended by defendant for his use upon his promise to repay the same, and money, to wit, rents, dividends and interest on securities belonging to the defendant, collected by Spencer in his lifetime and by him applied to his own use, upon the understanding and agreement that the same should be repaid to the defendant.

She further, by her answer, alleges that she was married to Spencer in the year 1879, and that from that time up to his death she had on various occasions loaned him these moneys, and sets out a schedule of the amount advanced in each year, amounting to $41,391.02; and that, in addition to those sums of money, she paid out other sums in the years 1891 and 1892, amounting to $1,031.82; and during the period from 1885 to 1888, inclusive, the sum of $1,012; and that from 1886 to 1896 Spencer collected and applied to his own use the sum of $3,240 belonging to the defendant; and during the period from May to October, 1890, she loaned Spencer, in addition to the sums of money above mentioned, the sum of $6,000, a large part of which was used in making improvements upon the lands in

question. And she claims to have paid in taxes and assessments upon the land the sum of $2,267.02, and to have spent since the death of Spencer, from her private fortune, over $6,000, for the purpose of paying his debts.

She neither admits nor denies that the amount of the complainants' claim against the estate of Spencer is due.

The answer does not set up any defence to the two notes upon which the complainants' claim is founded, nor does it deny that the defendant had an opportunity to have the validity of these notes tested in this state by giving notice to the administrator to require suit to be brought upon them.

At the hearing an attempt was made to show that there was a contest over the validity of the individual note of Spencer in another action pending upon that note begun in Texas before the proceeding here, and the pleadings in that connection were offered in evidence. They show that shortly after the taking out of letters of administration by the defendant in Texas, viz., on May 19th, 1898, complainants in this suit brought a suit in the district court of Galveston county, Texas, against Mrs. Spencer individually and as administratrix of J. C. S. Spencer, deceased, and on the 15th of June, 1898, an answer was filed by Mrs. Spencer, and that the suit was continued from time to time up to the hearing of this cause by agreement between the attorneys of the parties. The original answer is not set out, but on November 10th, 1899, an amended answer was filed by the defendant.

The pleadings in that suit show that suit was brought against Mrs. Spencer on the individual note of Spencer, dated May 30th, 1896, for $13,601.78, to the order of Ladd & Company, and by them endorsed to the plaintiffs. The petition (or bill in equity), after setting out the death of the maker, Spencer, and the letters of administration to Mrs. Spencer, the presentation of a sworn claim to her, alleges the insolvency of Spencer; the conveyance attacked by the present suit, and that they were made without consideration; and the prayer in effect is that Mrs. Spencer may be held to account for the value of the real estate in New Jersey as an asset in Texas.

The defendant, by her amended answer, filed November 10th, 1899, and after the filing of the bill in this cause, in lieu of her original answer—

*First.* Demurs, and alleges that the petition shows no cause of action against her either individually or as administratrix.

*Second.* Sets up, by way of answer, that there is an action pending, in which the petitioners are plaintiffs, upon the note in question, in the probate court of the county of Union, State of New Jersey, and before the chancellor of New Jersey; sets out the allowance by the probate court of the note as a just claim against the estate, and that the plaintiffs, in the suit before the chancellor, are seeking a judgment against the defendant and the estate of Spencer on said note and to have the property in question subjected to the payment of the note.

*Third.* The defendant denies all and singular the allegations of the plaintiffs' petition, and says that the same in manner and form as therein alleged is wholly untrue, and of this defendant puts herself upon the country.

*Fourth.* For a further and special answer, alleges that the plaintiffs are not the legal owners of said note, because it is held as collateral security to a certain other note made and executed by Ladd & Company for the sum of $12,000, dated the 22d of January, 1897, which latter note is still held by the plaintiffs, and that the note of $12,000 given by Ladd & Company to the plaintiffs, to which Spencer's note was collateral, was given for an indebtedness owing to plaintiffs by the firm of Ladd & Company, which firm was composed of Ladd and Spencer, and plaintiffs, in seeking a judgment herein against this defendant, are endeavoring to obtain an individual judgment against Spencer or his estate for said debt, which is due and owing by said firm of Wm. F. Ladd & Company, and for which said Wm. F. Ladd is jointly liable with said Spencer, and thereby to subject to the payment of said debt the individual property of Spencer, without first exhausting the property of Ladd & Company.

*Fifth.* That the note of $13,000 was given by Spencer to Ladd & Company to cover a supposed balance due said firm by

Spencer for an amount supposed to have been drawn out of the said firm over and above what was due to him as his part of the earnings and assets of the firm, while Spencer was not indebted to the firm of Ladd & Company, and that the fact was that Ladd was indebted to Spencer.

Further argumentative allegations are made to the effect that no recovery can be had in that suit without bringing in Ladd.

With regard to this record, expert evidence was given at the hearing, showing that the third answer, which is in the nature of a general denial or traverse, is, under the laws of Texas, invalid without some specification, and that the existence of the note and the debt is not thereby drawn in question.

Another matter set up at the hearing is that there was an application made in the probate court of Galveston, Texas, to compel Mrs. Spencer to inventory, as a part of the assets of the estate, the real estate in New Jersey.

I will dispose at once of this matter of the suits pending in Texas by saying that I do not perceive in them any defence to the present action. The object of both the common-law suit in the district court and that in the probate court is, in effect, the same, namely, to charge Mrs. Spencer with the value of the Union county property as an asset. Both suits are based upon the individual note of Spencer for $13,601.78, while the suit here is based, so to speak, upon both notes—that is, the individual note of Spencer and the note of Ladd & Company, of which firm he was a partner, for $12,000 and interest. Neither suit, when carefully examined, tends to show that the $13,000 note of Spencer is seriously contested, and the $12,000 note of the firm of Ladd & Company could not, of course, be contested because it is not made the basis of a claim in either suit. In this court the debt evidenced by the note of Ladd & Company is both joint and several, and the proof shows that Ladd, the surviving partner, is entirely insolvent and there are no firm assets.

Under these circumstances, I think the case is fairly brought within the authority of the leading case of *Haston* v. *Castner, 4 Stew. Eq. 697.* If the conveyances are fraudulent and void as

against creditors, then Spencer died seized of the premises in question, and, by virtue of the statute, the debt of Spencer to the complainants at the time of the death of the former became a lien upon those premises, and the only object of a suit at law upon the notes in question against the administrator of Spencer would be to fix with certainty the existence of the debt. That result has been accomplished by the formal allowance by the administrator in good faith of the claim after the defendant had had full opportunity to require the administrator to contest the same.

At the hearing it was further urged that the conveyances in question were made before the debt of the complainants accrued, and it may be well at once to fix the time when, for present purposes, those conveyances must be held to have taken effect according to the intention of the parties.

The interest of Mr. Spencer in the premises in question was that of a tenant in common with his sister, Mrs. Coote, who for many years has occupied the premises. Mr. Spencer does not appear to have had possession at all except possibly and probably during two or three months in the summer season, when his family were taking their ordinary vacation at the North. The original deeds exhibited show that they were both prepared at one time and by the same hand. They are typewritten on the same blanks, by the same machine, and both dated the 9th of September, 1896. The one from Spencer to Coote was executed by Spencer on the 30th of September, 1896, in Galveston, Texas, but there is no probability or presumption that it was delivered at that time, because undoubtedly and avowedly the object was to convey to Coote as a mere conduit to Mrs. Spencer. Hence I must infer that the deed was sent by Spencer to Governor Voorhees, acting as counsel for Mr. and Mrs. Spencer, and held by him without delivery until the deed from Coote to Mrs. Spencer was executed. That execution took place before Governor Voorhees, as master, on the 30th of January, 1897, and on the 1st of February both were recorded at one hour in the clerk's office of Union county. I can find nothing in the evidence or in the ordinary inferences from the admitted facts

from which I can infer or find that either of the deeds was delivered or took effect until the day of the last acknowledgment, January 30th, 1897. And it seems to me, also, that as to outsiders and creditors, the true date is that of the recording, February 1st, 1897. And this is the more imperative in this case as there was no change of possession whatever; and Mrs. Spencer distinctly swears that she neither took nor attempted to take any kind of possession of the premises until after the death of her husband, which occurred in Texas the following June. From her evidence—there is much confusion and uncertainty in it—I infer that she saw the deed from her husband to Coote at the time he had it in Galveston for execution. There are statements by her under oath which indicate that such was the fact, but in another part of her evidence she swore that she never saw the deeds until after her husband's death, when she came North and found them in Governor Voorhees' hands.

Next I will consider when the complainants' claim against Spencer arose.

The firm of Ladd & Company were dealers in cotton. They appear to have purchased cotton in the hands of the first holders for delivery at Galveston and then to have sold it—just how and where does not clearly appear, but I infer that they shipped it to some northern port and drew bills of exchange, with bills of lading annexed, against the shipment. They had no capital, as such, belonging to the firm. They had been in the same business together some fifteen or sixteen years before the date of the present occurrences.

The cotton season commences in August or September and closes the 1st of June. Prior to the season of 1896–97 they had been doing their banking with the banking firm of Ball, Hutchings & Company, supposed to be quite wealthy. Mr. Hutchings was the father of Mrs. Spencer, the defendant herein. Their partnership affairs were carried on under articles of copartnership dated the 27th of June, 1887, expiring in June, 1889, continued by further agreement till 1894, and continued by another extension agreement to May 31st, 1896. The fifth clause reads in this wise:

"And it is understood that any losses in the business or *overdrafts by either or both partners* that the books may show at the close of the season *shall be closed by his or their notes in favor of the firm,* secured by life insurance policy or policies *to the full extent of his or their indebtedness.*"

At the .end of the business year 1895–96, to wit, on the 30th· of May, 1896, the firm, as such, was hopelessly insolvent. It had overdrawn its account with Ball, Hutchings & Company to· the extent of $167,634.79. William F. Ladd owed the firm $103,990.30 and J. C. S. Spencer owed the firm $13,601.78. For those items the respective partners made their respective notes, dated the 30th of May, 1896, to the firm—Spencer for $13,601.78, payable in one year, and Ladd for $103,990.30. Spencer's note was retained in the possession of the firm. Ladd's note was delivered to Ball, Hutchings & Company, and Ladd immediately set about paying it, raising a considerable sum of money by mortgage and sale of his individual property, of which he had considerable, so that in a few months it was· much reduced. The indebtedness of Ladd & Company to Ball, Hutchings & Company has never been satisfied, and still stands· at over $100,000. They hold against this, life insurance on Ladd for $100,000.

It thus appears that although, on a final settlement between· the two partners, there would probably have been nothing due from Spencer to Ladd, yet by the clause in the agreement between them, above recited, and the practical construction they put upon it, the individual notes just mentioned were, as between the partners, valid notes and to be so treated as against them and in favor of third parties. Certainly, when passed away for a valuable consideration before maturity, to any third party, the Spencer note here in question was perfectly valid and binding upon Spencer, without regard to the state of accounts. between him and Ladd.

Notwithstanding their insolvency in June, 1896, as a firm and also as individuals, which has never been overcome, they had such a standing as business men in Galveston as to be able to· continue their business as cotton buyers, and for the purpose of carrying it on for another season, to wit, 1896–97, they made an·

arrangement with the complainants, who were also bankers and commission merchants, to advance them the moneys necessary for that purpose.   This was done in this wise: The complainants agreed verbally to permit Ladd & Company to purchase cotton and pay for it by checks drawn on the complainants, upon the pledge of their mercantile honor that all the proceeds of sale of the cotton so purchased should be turned in to the complainants to make good their account.   This arrangement was acted upon, and though not in writing and open to revocation at any time, yet my inference from the evidence is that the complainants were bound before revocation to honor any checks actually drawn for payment of cotton regularly bought by Ladd & Company in their business of dealers therein, according to the custom and practice in Galveston.   They did honor such checks, commencing with the latter part of July, 1896—very small at first, but increasing in size as the season advanced and cotton matured and came forward.   This account was naturally in a chronic state of overdraft, and there is some indication in the evidence and from an examination of the account that some checks were drawn and paid by complainants which were not drawn in payment for cotton.

In December and January complainants perceived, by the course of business and the state of the markets, that Ladd & Company were not making money; their account was going behind, as the witnesses expressed it, and complainants pressed them for a payment, with the result that on the 22d of January Ladd & Company gave them their note for $12,000, as above stated, and with it the note of Spencer for $13,601.78, dated May 30th, 1896, not yet due, and another note of the Ferris Gin and Compressing Company for $4,686.74, dated May 30th, 1896, and payable in one year after date, to the order of Wm. F. Ladd & Company.   That note is shown to be perfectly worthless.

On the day—January 22d, 1897—the principal note was given, Ladd & Company owed the complainants more than $12,000 and continued to do so until the close of the season, at which time they owed them a little more than $12,000.   No

16

part of it has ever been paid, except a payment on account of interest of $150 on January 4th, 1898. Nothing has ever been paid on the note of $13,601.78 made by Spencer.

These transactions are, of course, governed by the law of Texas (*Harral* v. *Harral, 12 Stew. Eq. 279*), and by the law of Texas the holder of a note as collateral security is a *bona fide* holder for value. The rule in *Swift* v. *Tyson* prevails there.

The $12,000 note given by Ladd & Company was not credited to their account by complainants until the close of the season, and when credited it left a small balance still due from them.

It was argued for Mrs. Spencer that the time when the state of indebtedness from Ladd & Company to complainants must be ascertained is of the date of the deeds, September 6th, 1896. I have already disposed of this argument by showing that the date of the conveyances must be postponed to the 30th of January, 1897.

But the defendant further argues that there never was any continuing indebtedness from Ladd & Company to complainants until after the 30th of January, 1897, for the reason that the account consisted of deposits and drafts made almost daily; that although the drafts exceeded the deposits generally to the amount of the indebtedness of $12,000, yet what is called the doctrine of the application of payments—the first payment to the oldest debt—which were made by deposits almost daily, resulted in extinguishing the debt which arose from overdrafts from time to time, so that the debt that was due on, say, the 1st of February, 1897, was extinguished by deposits made shortly after that time, and that any indebtedness which existed on the 22d of January was extinguished before the 1st of February, and any indebtedness which existed on the 1st of February was extinguished by subsequent deposits made shortly after the 1st of February.

The account on the 1st of February stood in this wise: The credits were $210,547 and the debits were $223,076, showing a balance of over $12,000 due complainants at that time. More than the amount of $12,000 was deposited within a month, and

during that month an equal amount was drawn again, and so on to the end of the account; so that the total drafts were $365,854 and the total credits, not including the $12,000 note, were about $353,500. This reasoning defers the accrual of the debt until the very end of the account in the last days of May and the first of June, 1897.

I am unable to adopt this view. It is inconsistent with the arrangement which was entered into between the parties in the first place, and which was never terminated but exhausted itself at the end of the season. That arrangement, as we have seen, was that complainants were to accept and pay all checks drawn in good faith by Ladd & Company in payment for cotton purchased in the ordinary course of business, upon the understanding that they were to have in payment the proceeds of the cotton when sold, and that arrangement was to endure, unless notice was given by the complainants, until the end of the cotton season. It contemplated a continued overdraft, because it was well understood that Ladd & Company had no capital with which to do business, and necessarily the complainants would be out of pocket and the account overdrawn during the time necessarily occupied in marketing the cotton. I think these circumstances forbid the application of the rule that the first payment must be applied to the older indebtedness. There was in this case no older indebtedness. It was one continuous thing, fluctuating in amount, but, notwithstanding that fluctuation, continuous.

Again, it was shown by a transcript of the account of Ladd & Company with Adoue & Lobit that on the 2d of October, 1896, three or four weeks after the date of the deeds, there was an apparent balance to the credit of Ladd & Company of about $4,000; but there were at the time, as shown by an examination of the books of Ladd & Company, outstanding checks not yet presented sufficient to overcome this balance and show a balance in favor of the complainants of over $1,000. If I had found that the date of the transfer of the property was September 6th, 1896, instead of January 30th, 1897, I should have been of the opinion that the circumstance that the account was about even on October 2d did not affect the transaction in question for two

reasons—*first*, the arrangement between the parties that complainants would honor Ladd & Company's checks, as before stated ; and *second*, that Spencer was at that time hopelessly insolvent, and, as a member of the firm of Ladd & Company, owed Ball, Hutchings & Company over $100,000, and was, as shown by the evidence, all the time pressed by Ball, Hutchings & Company for payment. Besides, the business of buying cotton that season was proving to be unprofitable, and hence it is quite plain that the deed was made at the time it was for the purpose of putting the property beyond the reach of Spencer's creditors, and hence void as to the complainants.

Further, the proofs show that complainants were informed at the start by Spencer that he was the owner of this New Jersey property, and hence may be considered as having trusted him on the strength of such ownership.

This brings us to the point seriously litigated in the cause, and that is whether Mrs. Spencer has established her real and only defence of having given to her husband a good consideration for this conveyance, and the conveyance having been made by her husband in satisfaction, *pro tanto*, of a debt he owed to her.

The consideration named in the deed is $1, and it is admitted that no consideration passed at or about the date of the transfer ; hence the burden is cast upon Mrs. Spencer of proving a good consideration. This she has undertaken to do, and the attempt has led to the taking of a large amount of evidence before a commissioner in Galveston, Texas, where Mrs. Spencer was twice put upon the stand and examined at great length by her counsel.

The consideration of this question renders it necessary to go into the history of the married life of Mr. and Mrs. Spencer. His origin was in Elizabeth, New Jersey. He went early in life to Galveston, Texas, and was there employed, so far as appears, at first as a clerk or business assistant in the business of buying cotton, and later on, two or three years before his marriage, as partner, with one-quarter interest, in the firm of Wm. F. Ladd & Company. He became acquainted with his wife, the

daughter of Mr. Hutchings, a rich banker. He married her in 1879, at a time when it sufficiently appears from the evidence that he had no property or any income except his small interest in the firm just mentioned.

He lived for two years with her parents, and then, after she began to bear children, of which there were six, they set up an establishment of their own, and somewhere about 1880 or 1881 Mr. Spencer's interest in the firm was increased to one-third of the profits and afterwards to one-half.

There was also, for a short time, a separate firm of Burns, Spencer & Ladd in existence, I think, at the same time that the firm of Ladd & Company was doing business.

Spencer's income was at first quite insufficient to support his wife and his growing family in the style in which she had been accustomed to live. They were in the habit of going to the North to spend their summers with the children, and presumably servants, which involved considerable expense.

Before she was married her father made her a present of some money-producing securities, among them a number—how many does not appear, but I infer eleven—of bonds of the Santa Fe railroad, which produced $770 a year; some gas stock, which produced at first $18.75 a month, or $225 a year, and afterwards $150 a year; some wharf bonds, which produced about $100 a year. There was also some wharf stock, but how much that produced there is no really satisfactory evidence. These securities were kept and managed by her father, and the income from them credited to an account, which was opened in her name, with Ball, Hutchings & Company in July, 1880, and against which she drew checks, and the income of those securities, as shown by a transcript, produced by her, of one side of her account with that bank, composed the whole of her separate estate until October, 1887, when her father commenced to deposit to the credit of her account $200 on the first of every month. She swears this was given as an increase of her income for her support. Later on he occasionally placed to her credit some additional money. At the end of June, 1889, he placed

to her credit $970.58. Just why those odd dollars and cents were placed there does not appear.

This transcript, with a few notable exceptions presently to be mentioned, stated the source of each item of Mrs. Spencer's credits as "gas dividend," "wharf dividend," "R. R. coupons," and the deposits made by her father are marked "J. H. H." or "J. H. Hutchings."

In 1890 there was an exchange made of a portion of her Santa Fe bonds for Atchison bonds, and the sale of the remainder, which is entered on her account with Ball, Hutchings & Company, in four items, under the head of "Securities Sold," namely, $1,000, $200, $500 and $1,316.31, a total of $3,016.31. In pencil on the margin of the account when it was offered in evidence were these figures: "Santa Fe, $23,730; Atchison, $20,713.69; difference, $3,016.31," which latter is the precise sum of the four items I have previously given.

The total of the credit of her account up to December, 1896, is $51,463.73, and of that figure it appears that she received from deposits from various sources $34,523.73, and from dividends and interest $16,940.

Now, out of that she swears that she paid for the support of the family, household expenses, clothing for the children, &c., during the married life, something over $40,000. She produces her checks and vouchers for these payments. They show payments of bills of the character stated, made out mostly to her individually, some to her daughter, Miss Minnie Spencer, and a very few for small amounts made out to her husband.

In this connection it is worth while to notice the proof as to Mr. Spencer's contributions to the support of the family. A transcript of his account with Ladd & Company from 1882 to the day of his death is produced and proven. It was kept by a gentleman named Van Harten, who was bookkeeper for the concern during all that time. He was sworn and testified that it was the habit of Mr. Spencer to pay his family expense bills by bringing the bills to Mr. Van Harten, and directing that the check of Ladd & Company should be given for them. That was done, and the amount was charged to Spencer's account, with the

name of the tradesman paid. In this way Mr. Van Harten became familiar with the names of the persons who furnished supplies for the use of the family, and going over that account he picked out payments made by Mr. Spencer of family expenses to the amount of $41,690.52. Besides that he testifies that there are items in the account—and it so shows—for money paid to or for Mrs. Spencer herself, to the amount of $5,319.33. I have gone over that account of cash paid to her and find items amounting to $2,339.35 for cash charged as paid directly to Mrs. Spencer, and of $2,625 for various sums placed to her credit on the books of Ball, Hutchings & Company, and in comparing the transcript of the account of Spencer with Ladd & Company, and that of Mrs. Spencer with Ball, Hutchings & Company, I find the items of charges to Spencer amounting to $2,625 for moneys deposited to his wife's credit with Ball, Hutchings & Company to correspond precisely in date and amount with items credited to her on the books of Ball, Hutchings & Company, and marked thereon as "deposit" simply, without giving the source of the deposit. I further find items on the former account amounting to $1,000 of cash charged to Spencer, and on Mrs. Spencer's account I find credits of cash of the same date and amount, without stating the source.

It thus appears that during the period in question Mr. Spencer paid directly for family expenses the sum just mentioned, and $41,690.52, besides giving to his wife the sum of $5,319.33, and probably more.

Besides that there are other items of expenses charged to Spencer by Ladd & Company, which were undoubtedly for traveling expenses for the family at the North, and they amount in the aggregate to a very large sum—several thousand dollars.

I infer from the entries on Ladd & Company's books that when at the North traveling with his family, Mr. Spencer was in the habit of drawing drafts on Ball, Hutchings & Company, which were accepted by them, and immediately paid by the firm of Ladd & Company. On July 31st, 1890, there was a draft of that character of $500, and August 30th, $1,050; on May 4th, 1891, there was a payment to Lord & Taylor (well-known

dry goods merchants in New York) of $437.40 charged to him; on May 22d there was a charge against him for New York exchange, $975; on August 31st, 1891—traveling season—drafts from Elizabeth, $1,000; September 22d, the First National Bank of Elizabeth, $300; September 30th, drafts from Elizabeth, $700; December 2d, First National Bank of Elizabeth, $150; June 9th, 1892, New York exchange, $1,000; August 31st, drafts on Ball, Hutchings & Company, $1,000; September 30th, draft from Elizabeth, $1,300. Then in July and September, 1893, there are two telegraph transfers of $50 and $100 each; on October 21st is a draft in favor of Foster M. Voorhees, $1,300; January 13th, 1894, $600, in favor of Foster M. Voorhees; on August 31st, draft from Elizabeth, on Ball, Hutchings & Company, $500; June 18th, 1895, Mrs. Coote, telegraph transfer, $103; October 31st, draft from Elizabeth, on Ball, Hutchings & Company, $1,000.

These moneys were all paid by Ladd & Company and charged to Spencer.

No explanation was made of these items by Mrs. Spencer or by her counsel, although, between the time when this account of Spencer with Ladd & Company was exhibited and the evidence of Mr. Van Harten, taken in Galveston, Texas, in May and June, 1899, and the time the cause was brought to hearing in open court in October, 1899, Mrs. Spencer had ample time to dispute it, and was present at the hearing but was not sworn, contenting herself with her evidence given before the commissioner in Galveston.

In addition to these contributions to the support of the family and direct payments to Mrs. Spencer, the accounts of Spencer with Ladd & Company show numerous payments of cash to Spencer in person in small sums. The amount of these payments indicate that they were used for pocket money, and as there is no proof that he was idle or inclined to indulge in personal extravagances, we may safely infer that much of that money went to pay family expenses.

The inference naturally drawn from these facts and the evidence in the cause is that Mrs. Spencer, with her growing

Adoue v. Spencer.

family, desired to live in a style and at an expense which her husband's financial condition would not warrant; that her father was wealthy and quite able to supplement what was necessary in order to enable her to attain that style with justice to her husband; that she voluntarily contributed the income of her estate for that purpose, and when that income was insufficient her father gave her the additional sum of $200 a month for that purpose, and that it was so expended by her without any expectation of ever asking her husband to pay any part of it, or that the position of debtor and creditor arose thereout. The fact that the husband contributed at least as much as the wife, and that he actually furnished her a good share of the money which she spent, shows that he was inclined to contribute and did contribute his just share of the expense of their living.

It is not necessary to cite authorities to show that from such a state of facts no cause of action arose in favor of the wife against her husband which will serve as a consideration for a conveyance of land as against creditors.

Going back to Mrs. Spencer's evidence, after proving these payments for family expenses, she went into an elaborate statement of conversations between her and her husband as to his being indebted to her for these advances for their living and her urging him to convey the Elizabeth property on account of it, and of promises on his part to do so. Seasonable objection was made to her testimony in this respect, and elaborate argument was had as to its competency. For present purposes I shall consider it as competent and deal with it as such.

It is to be remarked that Mrs. Spencer, as appears by the evidence, had two brothers and a father living, neither of whom were sworn in support of her statements, and no reason was given why they were not called.

Confessedly there never was any *insimul computassent* between the husband and wife, or any fixing of amount by any means. There was no written memorandum of any sort. The case as against the husband depends entirely upon the wife's own evidence of conversations with him, except as to the payments for which she produces vouchers.

The dangerous and unreliable character of this kind of evidence, and the indisposition of the courts of this state to base judicial action upon it, has been illustrated in numerous instances, some of them much like the present.

Before considering the details of those conversations, let us consider whether she has shown herself reliable in other respects.

Among other things, she swore that the difference between the Santa Fe and the Atchison bonds, which I have shown to be a little over $3,000, was over $7,000, and that that money was transferred from Texas to Elizabeth, deposited in one of the banks in Elizabeth and used there for repairing the Spencer homestead, the property in dispute. Not a particle of other evidence is produced to support her in that respect. The books of the bank at Elizabeth are not produced ; no evidence is given that any money was spent upon the house, and if any, how much ; no checks are produced—although all vouchers appear to have been carefully preserved—showing where any money was transferred from her account in Texas to Elizabeth, nor was any evidence, except her own, produced to show that the figures in pencil, on the account current produced by her, showing the profit on the Atchison and Santa Fe trade to be $3,016, were not accurate.

I can perceive how she came to think there was a profit of $7,000 on the exchange of bonds. The original batch of Santa Fe bonds produced, as shown by her account, $770 a year, and if they were seven per cent. bonds, as they may have been, there were eleven of them. If they bore less than seven per cent. interest, then, of course, there were more. They were turned in in the exchange at $23,730. That figure probably was arrived at because they were probably not yet due and bore a premium in the market. In exchange she received twenty Atchison bonds, bearing five per cent. coupons, in part payment. Upon these she received $1,000 a year, as snown by her account. The result was that she had $3,000 in cash and an increase of over $230 a year in her income. From this she may well have got the idea that she made $6,000 or $7,000 by the trade. But that does not warrant her assertion that nearly all of that money

went to Elizabeth and was used for the benefit of her husband and in improving the property here in question. And I repeat that if her statement in that regard was true it could have been verified and supported by the evidence of checks and drafts, and of her father or brothers, and of available witnesses at Elizabeth.

Then with regard to the funds in the Elizabeth bank, the evidence shows, as we have seen, that her husband transmitted large sums to Elizabeth during the very period in which she swears she was spending money there from the proceeds of the Santa Fe bonds. (It appears they spent some time each summer in the Elizabeth house, and incurred ordinary family expenses in so doing.)

Mrs. Spencer swears that she paid bills and debts of her husband after his death, amounting to at least $6,000. She brings forward no vouchers to cover these payments. All her payments for the support of the family and so forth are supported by checks and receipted bills, assorted and arranged under each calendar year by itself, up to July, 1897, just after her husband's death, and one small bundle of three checks, amounting to $454, was produced and marked "Exhibit No. 3" by the commissioner, which was not among those handed up to me. These last she swears were for payments on her husband's account after his death, made in 1899, and she testifies there were others, but she was advised not to produce them.

Now, if after her husband's death she paid any such large sum as she has testified to, it was quite easy for her to produce the vouchers, and I see no reason why she should be advised not to do so. Her failure to do so satisfies me that her first statement in that behalf was unreliable.

She was first sworn and examined on May 17th and 18th, 1899. On that occasion she swore generally to her yearly expenditures for the family, using for that purpose a memorandum made up, as she swore, by herself and a gentleman friend not named. This memorandum was not put in evidence nor any vouchers produced at that time. She was recalled to the stand on May 22d, 1899, when she first produced what purports to be

Adoue v. Spencer.

a copy or transcript—already referred to—of the credit side of her account with Ball, Hutchings & Company, commencing July 1st, 1880, and ending December 16th, 1896. She says it was made out by Mr. Hoffmaster, but does not state who Mr. Hoffmaster is or why he was employed to make it out. No sworn proof was given that it was a correct transcript of her account on the books of Ball, Hutchings & Company. She simply swears that it was her account. The debit side was not shown, nor was there any general exhibit of all her vouchers. An examination of that transcript shows that it states the origin of the great majority of the items to her credit. They are put down as "Gas dividend," "Wharf interest," "R. R. coupons," &c. The payment of $200 deposited monthly by her father to her credit and a few other such credits are marked "J. H. H." or "J. H. Hutchings." Besides these credits so marked as to show their origin, there are twenty-three items, aggregating $6,366.25, marked simply "Deposit," without indicating an origin. Of these items I find ten, amounting in the aggregate to $3,725, correspond precisely in date and amount with items of cash charged to Spencer on the books of Ladd & Company, and of these $2,625 are there stated for money deposited by Ladd & Company to Mrs. Spencer's account with Ball, Hutchings & Company.

When first on the stand, on cross-examination Mrs. Spencer testified as follows:

"*Q.* During all the years of your married life, did Mr. Spencer ever give you any money for household expenses?

"*A.* On several occasions Mr. Spencer deposited several hundred dollars at the bank for my credit, when I was overdrawn; I think the largest amount was—I think once, for as much as $350—none of this money, none of it was included in any of my statements, it was purposely excluded from any of my statements.

"*Q.* That is to say, in figuring up the total amount expended by you, you deducted the amount he gave you?

"*A.* He never gave them, he deposited them and the deposit is shown on my bank book, as it is called a 'special account;' he never deposited it with my own proper money; I won't hesitate to say under the circumstances I did not care, I had always supported myself, had always cared for myself and children, did not care to accept money from Mr. Spencer.

"*Q.* But you are now endeavoring to establish a debt against him, are you not?

"*A.* I do not regard that at all as unjust; Mr. Spencer was in a very bad state of health, and I nursed him and cared for him, and sacrificed not only my pocket but my health, and I have six children which are also his, and I spent all my personal money for the benefit of him individually and personally and for his family, and he certainly owed me redress for it, all that was in his power to give, and he gave me this place in Elizabeth to me; that is the whole thing in a nutshell; he certainly owed it to me; of course, what the other claims are, the law has to decide—what the proper claims are, but I do claim during all these years of my married life I spent my own means, absolutely all of them, for the maintenance of myself, my family and Mr. Spencer and he gave me this place in Elizabeth, N. J., in proper consideration that I had so done, and regarded it himself as a debt; that was his only way of making me any repayment of what I had expended—to give me that place, which he did."

She was again examined on that topic when called a second time, and produced the so-called transcript of her bank account. Then she testified, in answer to her own counsel, as follows:

"*Q.* Please state again, Mrs. Spencer. I do not want to worry you about this, but I want to bring it out clearly what all of those different amounts of moneys that appear on this account to your credit there were received from— what source they were received from; that wherever it appears there marked as deposits and otherwise marked than as dividends, interest and coupons?

"*A.* All the money marked as deposits and all that marked otherwise than coupons, dividends, stocks and bonds was given to me; it was cash given to me by my father and mother."

On cross-examination she said:

"*Q.* When you stated this was all the money you received during the period covered by this account, do you mean to say you received no money whatever from Mr. Spencer during that time?

"*A.* I received no money from Mr. Spencer, to my knowledge, of any large sums; he might have given me $2 or $5, or something of that sort; that is all the cash; you will understand what I mean; I do not remember anything of any amount that he ever gave me except the two special items which I before stated the other day, when you asked me, and I mentioned these, and they were not in the account."

She was then examined categorically as to certain deposits to her credit made between 1890 and 1896, and declared that none

of them were made by her husband; I find that they manifestly were made by her husband.

Now here we have the remarkable circumstance that this transcript of account is produced without being duly verified as a true copy; that most of the items of credit show their source; that these twenty-three items, aggregating $6,366.25, fail to show such origin, and of those, ten items, amounting to $3,725, are traced with reasonable certainty to her husband. Now how did it happen that these items on the transcript show no origin? One can hardly resist the suspicion that on the books of Ball, Hutchings & Company their origin is shown, but was purposely omitted in the transcript. The transcript shows on its face careful study by Mrs. Spencer.

These tests of Mrs. Spencer's accuracy lead to the conclusion that she is far from reliable.

I now come to a consideration of her evidence with regard to the conversations with her husband, upon which reliance is placed to show his acknowledgment of his indebtedness to her, and that that indebtedness formed the consideration for these conveyances. A careful examination of them shows that there is a failure of any proof of any acknowledgment of legal indebtedness of the husband to the wife, or of a promise to pay the same. She frequently, commencing ten years before his death, asked him to convey the Elizabeth property to her, urging as a reason that she had supported the family and that it was his duty to make a provision for her and the children. By this plainly she meant a provision for the family, and not the payment of a debt. Her evidence at first was that he either absolutely refused to make the conveyance or was silent. He put her off by promising to have his life insured for her benefit; and, in point of fact, she did not know of his intention to convey the property until almost the time it was done. In one place she did, indeed, say that Mr. Spencer told her previous to making the deed that he would give her the Elizabeth property to reimburse her for what she had already spent in the support of the family, and she fixed the date of this promise in 1888

Adoue *v.* Spencer.

"*Q.* When did he say anything about it?

"*A.* The last time we spoke of that was in 1888 until the day when he handed me the deeds and said, 'Well, now I have given you the place in New Jersey.'

"*Q.* What was said in 1888 about it, if anything?

"*A.* He said he had given me this accident policy, which I declined; I told him I preferred the other.

"*Q.* Did he say he would?

"*A.* He did not say he would do it, but I inferred he was going to do that, which he afterwards did do.

"*Q.* That is all that took place between you with reference to that?

"*A.* That is all that took place between us; if I am allowed to say here, I never heard of the existence of this note."

(Bear in mind that it plainly appears that she never had the deed in her hands until after her husband's death.)

And further on, urged by her counsel to state more fully these conversations, she said :

"*A.* That is what I said, I thought he should make provision for us in some way, secure my rights in some way, either to the Elizabeth property or to his life insurance, which was then held by Ball, Hutchings & Company.

"*Q.* What response did he make?

"*A.* He said he would make provision for me; Mr. Spencer always intended to give me the Elizabeth property; after the conversation, as near as I can remember, I think it must have been 1886, but I am not perfectly clear about the date it was, but at the time—I cannot remember the year exactly, but it can be ascertained beyond any doubt; it was at the time when he made this life insurance policy for his sister; the life insurance policy was made in Elizabeth, New Jersey."

Further on, still urged and led by her counsel, she ventured to swear that he had promised, in 1886 or 1888, to give her the Elizabeth property.

A careful consideration of the whole of the wife's evidence, and giving her full credit for reliability and accuracy of memory, fails to satisfy me that there was ever any contract on the part of the husband to pay the wife for her contributions to the support of the family by the conveyance of the property here in question, or otherwise.

On the contrary, I am satisfied from a careful reading of the whole of her evidence, in connection with the admitted facts of

the case, that the payments of money relied upon by the defendant were voluntary contributions given by her towards the support of the family, out of which no debt from the husband to the wife could or did arise, and none was understood by the parties to arise; that the husband never acknowledged any legal obligation, but that all that was said by him in that direction was the mere acknowledgment of the natural obligation of a father to provide for his family.

So much for the principal claim of the defendant, which consists of contributions to the expenses of the family.

I further find, as already remarked, that there is no evidence at all sufficient to warrant judicial action that Mrs. Spencer ever invested any money in improvements on the Elizabeth property.

There remains the claim on her part that her husband took for his own use dividends amounting to over $3,000 declared on certain shares of stock in the wharf company standing in her name. There is here also a defect of proof, certainly as to the amount so received.

To this, as well as to all contributions made by her to the living expenses of the family which were derived from her income from her separate estate, the complainants set up the community law of Texas, which was offered in evidence and thoroughly and elaborately discussed.

The discussion satisfies me that that law gives the husband the complete control of all the income of the wife derived from her separate estate, and prevents her, in the absence of a special contract to the contrary, from founding any claim of indebtedness against him by reason of his having received those dividends.

This disposes of the whole defence and results in a decree for the complainants.

No discussion was had by counsel as to the form of the decree to which complainants are entitled, and I have been unable to find a precedent for a decree in a case like this. The one-half interest in the property in question must, of course, be sold and the proceeds applied to the payment of Spencer's debts; but whether the decree should direct that the money should be paid to the administrator or to the complainants was not discussed.

The administrator is a party defendant. He has not answered or set up any claim to any part of the fund for the benefit of any other creditor. It does not appear that any other creditor has applied to the administrator to share in this fund. I am inclined to the opinion that in the absence of any claim on the part of the administrator the complainants should be paid the whole amount of their claim, if the property shall bring so much. If it shall bring more, the surplus must be paid into this court to abide the further order of the court.